UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minneapolis Taxi Owners Coalition, Inc.,        Civil No. 07-1789 (JMR/FLN)

    Plaintiff,

    v.                                              **REPORT AND RECOMMENDATION**

City of Minneapolis,

    Defendant

and

A New Star Limousine and Taxi Service, Inc.

    Intervenor.

_____

Lawrence H. Crosby for Plaintiff.
Timothy S. Skarda for Defendant.
Scott J. Bullock for Intervenor.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on August 31, 2007, on Intervenor's Motion to Dismiss [#25], and Intervenor's Supplemental Motion to Dismiss Count Five [#30]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Intervenor's Motion be **GRANTED**.

**I.      ASSUMED FACTS**

The Minneapolis Taxi Owners' Coalition ("the Coalition") is an organization of individuals who own taxicab vehicle licenses issued prior to October 1, 1995 by the City of Minneapolis ("the City"). (Compl. ¶ 3.) The City issued 273 licenses before October 1, 1995, all of which are

transferable in that they can be bought and sold. (Compl. ¶¶ 8-9) Since October 1, 1995, the City has issued 343 non-transferable licenses. (Compl. Ex. C at 1.) The Coalition members own about 75 transferable licenses. (Compl. ¶ 12.) In 2006, the City amended its taxi ordinance to remove the cap on the number of taxi licenses issued. Minneapolis, Minn., Code of Ordinances, title 13, ch. 341, sec. 300. The amendment provides that the City will issue 45 additional taxi licenses every year until 2011 when it will remove the cap altogether. *Id*. Until the City of Minneapolis ("the City") amended the ordinance, the transferable licenses had a market value ranging between $18,000 and $24,000. (Saleem Aff. ¶ 4, Strouts Aff. ¶ 5.) Now the transferable licenses are almost impossible to sell because entrants to the market can get licenses from the City for a relatively nominal fee. (Compl. ¶ 32.)

Prior to the ordinance amendment, the City held yearly "public convenience and necessity hearings" where the City Council would determine, based on a number of factors, whether it would issue new taxi licenses that year. (Compl. Ex. E, a copy of the pre-existing ordinance that includes the changes made to it in 2006.) The factors considered by the City Council at the public convenience and necessity hearings were:

a. The level and quality of service being provided by existing taxicab operators;
b. Whether additional competition would improve the level of and the quality of service or the degree of innovation in delivery of services;
c. The impact upon safety of vehicular and pedestrian traffic;
d. The impact upon traffic congestion and pollution;
e. The available taxicab stand capacity;
f. The public demand and need for service;
g. The impact on existing operations; and
h. Such other relevant factors as the city council may deem relevant.
(*See* Compl. Ex. E at repealed sec. 341.270(a))

In addition to removing the cap on taxi licenses, the City made additional changes to the taxi ordinance. The new ordinance also requires that new service companies have a fleet size of at least

15 vehicles, ten percent of which must be wheelchair accessible and ten percent of which must be fuel efficient or run on alternative fuel. Minneapolis, Minn., Code of Ordinances, title 13, ch. 341, sec. 300(b). Service companies in existence on or before November 1, 2006 must also meet these standards by December 31, 2008. *Id*.

In Count One, Plaintiff alleges that the City deprived its members of their business licenses without due process of law and their "property interests" in their licenses were taken without just compensation. (Compl. ¶¶ 42-63.) In Count Two, Plaintiff alleges that the City deprived the Coalition members of their property interest in the value of the licenses on the secondary market without just compensation. (Compl. ¶¶ 64-73.) In Count Three, Plaintiff alleges that the wheelchair accessibility requirements constitute an "unconstitutional exaction." (Compl. ¶¶ 74-86.) Count Four alleges that the City's decision to change the law resulted in a reduction in the value of the licenses to nothing on the secondary market, an outcome that constitutes a regulatory taking. (Compl. ¶¶ 87-96.) Count Five alleges that the Plaintiff's members were denied Equal Protection of the laws because the City amended the ordinance, in part, to better serve the Hispanic community. (Compl. ¶¶ 97-108.)

## II.    STANDARD OF REVIEW

Intervenors move to dismiss the Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In analyzing the adequacy of a complaint under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. *See Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir. 2002). For the purpose of a motion to dismiss, facts in the complaint are assumed to be true. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 738 (8th Cir.2002).

Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. *Neitzke v. Williams*, 490 U.S. 319, 326-327 (1989). To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.1998). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief about the speculative level on the assumption that all the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (U.S. 2007)**.**

### III.   LEGAL ANALYSIS

**A.    License holders do not have a protectable property interest in the value of their licenses on the secondary market (Count Two and Four).**

The Supreme Court has "dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124-25 (1978) (citing *United States v. Willow River Power Co.*, 324 U.S. 499 (1945) (interest in high-water level of river for runoff for tailwaters to maintain power head is not property); *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913) (no property interest can exist in navigable waters)).

In *Willow River*, the Supreme Court held that "not all economic interests are 'property rights'; only those economic advantages are 'rights' which [are recognized by law], and only when they are so recognized may courts compel others to forbear from interfering with them or to

compensate for their invasion." 324 U.S. at 502. *See also Jackson Sawmill Co., Inc. v. United States*, 580 F.2d 302, 308 (8th Cir. 1978) (owners of municipal bonds used to fund construction of a bridge had no constitutionally recognizable property right in a monopoly over traffic going between St. Louis and East St. Louis); *Rogers Truck Line, Inc. v. United States*, 14 Cl. Ct. 108, 112 (1987) (owners of special trucking licenses did not have a constitutionally protected property interest in the value of their licenses on the secondary market). In *Penn Central*, the Supreme Court explained that there must be a limit on compensation to individuals whose property has diminished in value by virtue of government action: "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." 438 U.S. at 124 (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).

In *Jackson Sawmill*, the plaintiffs purchased municipal bonds from the City of East St. Louis, Illinois, to fund the construction of the Martin Luther King Bridge between that city and St. Louis, Missouri. *Id*. at 304. The trust agreement for the bonds provided they would be paid for using money raised from tolls and other bridge revenues. *Id.* at 305. It also stipulated that the City of East St. Louis would not permit construction of a bridge within the city limits that would divert traffic and diminish revenues. *Id*. Nevertheless, some years later, the City of East St. Louis, in conjunction with a number of other governmental entities, agreed to build a new bridge which resulted in traffic being diverted from the Martin Luther King Bridge and caused the City of East St. Louis to default on the bridge bonds. *Id*. The bondholders sued, alleging, *inter alia*, that they had been deprived of their property interest in what the court called "a monopoly over traffic traveling between St. Louis and East St. Louis." *Id*. at 307.

In denying the plaintiff's claim that they had such a property interest, the court reasoned:

5

> Under no interpretation of the facts, no matter how we strain to be favorable to their claim, do appellants have anything more than two covenants issued by the City of East St. Louis. The covenants entitle them to an exclusive right to revenues from the King Bridge . . . *Id.*

This property interest in the bonds did not give rise to a constitutionally recognizable property interest in a monopoly over traffic traveling between St. Louis and East St. Louis. *Id*. at 311.

Similarly, in *Rogers Truck Line*, Congress passed a law lifting the limit on the number of common carrier authorities (which are essentially licenses to transport specific goods between two locations) available for transporting goods via truck. *Id.* at 109. This law resulted in a marked decrease in the resale or lease value of the authorities. *Id*. The plaintiffs, owners of authorities, alleged that they had a property interest in the authorities which was taken from them without just compensation. *Id*. The court rejected this argument, reasoning that the authorities did not give the plaintiffs the exclusive right to transport the designated goods over the designated routes, nor did the authorities give plaintiffs a constitutionally protected freedom from competition. *Id*. at 110-111.

In this case, the Court finds that the license holders do not have a property interest in the value of the taxicab vehicle license on the secondary market because the issuance of the license does not entitle them to that value, nor does it provide for its legal protection. The license allows its holders to drive a taxi in the City. It does not guarantee that the City would indefinitely limit the number of taxi licenses issued. Even under the former ordinance, the City was required to conduct a hearing at least every 24 months to determine whether "public convenience and necessity" warranted additional licenses. (Compl. Ex. E at fmr. sec. 341.270(a)). Furthermore, the City, as a law-making entity, is free to amend ordinances as it sees fit. Like the trucking authority holders in the *Rogers Truck Line* case, the taxicab vehicle license holders do not have a constitutionally

protected freedom from competition.

Counts Two and Four are premised on the argument that the taxicab vehicle license holders have a protectable property interest in the value of their licenses on the secondary market. In Count Two, Plaintiff alleges that the license holders were deprived of their property without just compensation, in violation of the Fifth Amendment. In Count Four, Plaintiff alleges that the City's actions that resulted in the license holders being deprived of the value of their licenses on the secondary market constituted a regulatory taking, in violation of the Fifth Amendment. Because the Court holds that the license holders do not have a property interest in the value of the licenses on the secondary market, it dismisses Counts Two and Four.

## B. The Due Process Claim Fails (Count One)

In Count One, Plaintiff alleges that the license holders were deprived of their licenses without due process of law, in violation of the Fourteenth Amendment. (Compl. ¶ 43.) This claim must be dismissed because the City's amended ordinance did not deprive Plaintiffs of their licenses. Under the amended ordinance, the City increased the number of licenses available but did not revoke any licenses that were already issued. (*See* Compl. Ex. D and E.) Count One also alleges that the Plaintiff's members were deprived of their property without just compensation. (Compl. ¶ 48.) The Plaintiff makes this allegation more fully in Count Two and the Court addressed this takings claim in Section A of this Report and Recommendation.

## C. Plaintiff does not have standing to bring its unconstitutional exaction claim (Count Three)

The United States Supreme Court held that the "irreducible constitutional minimum" of standing requires that *the plaintiff* have suffered an "injury in fact." *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (emphasis added).

Plaintiff alleges in Count Four of the Complaint that the wheelchair accessibility and the fuel efficiency requirements are an "unconstitutional exaction." (Compl. ¶ 83.) However, these requirements are mandated on *licensed service companies*, not on taxicab license holders. In the Complaint, Plaintiff identifies its members as individuals who hold "fully-transferable City of Minneapolis taxicab licenses." (Compl. ¶ 2.) Plaintiff does not allege that any of the license holders in the Coalition also holds a service company license and therefore lacks standing to bring the claim.

**D. The Equal Protection Claim Fails (Count Five)**

Plaintiff alleges that the City relaxed its licensing quota only to benefit "the Hispanic Community," in violation of the Equal Protection clause of the Minnesota Constitution, Minn. Constit. art 1, § 2. (Compl. ¶ 99.) Under Minnesota law, "[i]f a constitutional challenge involves neither a suspect classification nor a fundamental right, we review the challenge using a rational basis standard under both the state and federal constitutions." *Gluba ex rel. Gluba v. Bitzan & Orhen Masonry*, 735 N.W.2d 713, 719 (Minn. 2007). Under rational basis review, the court determines "whether the challenged classification has a legitimate purpose and whether it was reasonable [for the legislature] to believe that use of the challenged classification would promote that purpose." *Id*. at 721 (quoting *Kolton v. County of Anoka*, 645 N.W.2d 403, 411 (Minn. 2002)). The rational basis standard under Minnesota law is "higher" than that applied under federal law. "The key distinction between the federal and Minnesota tests is that under the Minnesota test 'we have been unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires.'" *State v. Garcia*, 683 N.W.2d 294, 299 (Minn. 2004) (quoting *State v. Russell,* 477 N.W.2d 886, 889 (Minn. 1991)).

The law in this case is neutral on its face; that is, it does not involve a suspect classification and is therefore subject to rational basis scrutiny. The amended ordinance does not classify in any way on the basis of race. The ordinance provides that it will issue 45 new licenses each year until 2011 when it will lift the cap on the number of licenses. It also mandates fuel efficiency and handicap accessibility standards. The law does not make any classification at all. The City has set out a list of factors to consider in issuing the 45 licenses each year until 2011 when it will lift the cap.

Plaintiff has failed to allege that the City's amendment of the ordinance had no legitimate purpose. In fact, Plaintiff's complaint includes the City's list of reasons for passing the amendment, a number of which undoubtedly qualify as a legitimate government purpose. In paragraph 35 of the Complaint, Plaintiffs allege that a City Staff member stated the City's reasons for passing the ordinance, which included pursuing a policy that promotes "environmental stability" and better serves "disabled" individuals and "non-English-speaking populations." Because Plaintiff has not alleged that the City provided no legitimate purpose for amending the ordinance, its equal protection claim must fail.

This claim is not analyzed under strict scrutiny because Plaintiff has failed to allege that the law has a racially discriminatory impact. *See State v. Russell*, 477 N.W.2d 866, 888 n.2 (Minn. 1991) (under Minnesota law, to invoke strict scrutiny in an equal protection case, a plaintiff must establish discriminatory impact and show that the legislation was enacted with the purpose to effect a discriminatory impact or was enacted with indifference to the discriminatory impact). Here Plaintiff does not properly allege a racially discriminatory impact. Plaintiff alleges only that members of the Coalition "are themselves in many cases members of immigrant and minority
9

groups." (Compl. ¶ 101.) This language does not allege that the new ordinance has had a racially discriminatory impact on any particular racial or ethnic group.

## IV.     RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Intervenor's Motion to Dismiss be **GRANTED** [##25 & 30].


DATED: October 26, 2007                           s/ *Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **November 15, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **November 15, 2007,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.